UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
S.K.I. BEER Corp.,

                       Plaintiff,

     -against-                            <u>MEMORANDUM AND ORDER</u>
                                                       05-CV-1161 (ILG)

BALTIKA BREWERY,

                       Defendant.
------------------------------------------------x

GLASSER, United States District Judge:

# **INTRODUCTION**

      The present dispute arises from an agreement between Baltika Brewery ("Defendant" or "Baltika") and S.K.I. Beer Corporation ("SKI" or "Plaintiff").[1] SKI contends that Baltika's cancellation of the agreement without notice violated <u>N.Y. Al. Bev. Con. Law § 55-c</u> ("ABCL § 55-c" or "Statute") and constituted a breach of contract. Baltika moves to dismiss based upon a forum selection clause in the Contract (hereinafter, "FSC"), providing for the dispute to be adjudicated in "the Arbitration Court in St. Petersburg and the Leningradskaya Oblast" (<u>Klie Decl.</u>, Ex. A, "Contract" ¶ 4).[2] For the following reasons, Defendant's motion is granted.

# **BACKGROUND**

---

     [1] Plaintiff's actual name, "S.K.I. Wholesale Beer Corporation," was not properly captioned. Defendant has no objection to amending the caption to state the Plaintiff's proper name. Plaintiff's name is hereby corrected <u>nunc pro tunc</u>.

     [2] Defendant contends and Plaintiff does not dispute that the Arbitration Court in St. Petersburg is, in fact, a state-run commercial court. (Def. Mem. 5).

The circumstances giving rise to the Complaint are not disputed. The parties entered into an agreement, dated May 27, 2003, in which Baltika agreed to supply SKI with "beer and alcohol-free products" (Contract, ¶ 1.1). The Contract provided that acceptance of goods would be had at the "place of shipment," and that delivery be deemed made when the buyer signed the "shipping documents."[3] (Id. ¶¶ 7.1, 7.2). The goods were to be delivered "on the terms FCA (3, 6-th Verkhniy Pereulok, St. Petersburg, Russia) (INCOTERMS 2000)."[4] (Contract ¶ 1.1). By the terms "FCA St. Petersburg," or "free carrier St. Petersburg," the goods, as well as the risks and subsequent transportation costs, were transferred from Baltika to SKI in St. Petersburg at the address of the Baltika Brewery identified in the Contract. Thus, Plaintiff assumed both the risks and the costs of transporting the beer out of Russia. The Contract did not specify the final destination for the goods.

The Contract also permitted either party to terminate it unilaterally, provided that "the Parties shall agree mutual payments within 10 days after a request."[5] (¶ 13.7). Finally, the Contract contained a mandatory foreign forum selection clause for the

---

[3] ¶ 7.1    Acceptance shall be carried out in the place of shipment of the Goods by the Seller to the Buyer or to his duly authorized representative acting by virtue of a power of attorney (original or facsimile copy).

   ¶ 7.2    A batch of the Goods shall be considered handed over by the Seller and accepted by the Buyer as to quantity at the moment of the signing the shipping documents by the Buyer or by his duly authorized representative.

[4] "Incoterms" are standardized commercial shipping terms used by merchants to specify when risks and liabilities shift from seller to buyer. Texful Textile Ltd. v. Cotton Express Textile, Ltd., 891 F.Supp. 1381, 1389 n. 6 (C.D. Cal. 1995) (noting they are the most widely recognized non-statutory definitions of trade).

[5] ¶ 13.7   The Contract may be terminated by either Party in a unilateral order before the expiration of its term of validity, in which case a notice in writing shall be signed by duly authorized persons. The Parties shall agree mutual payments within 10 days after a request.

Arbitration Court of St. Petersburg,[6] and a choice of law provision designating the "laws of the Russian Federation."[7] (Contract ¶¶ 11.1, 11.2).

The Complaint alleges that "on or about June 31, 2003, Baltika refused to fill SKI's most recent order, and...indicated that it would not fill any future orders." (Compl. ¶ 14). Plaintiff contends that this constituted a termination of the agreement. Plaintiff asserts two causes of action arising from this termination. The first is a claim under N.Y. Al. Bev. Con. Law 55-c, which prohibits "brewers" from terminating agreements with "wholesalers," unless such termination occurs for "good cause," statutorily defined, or as part of a national wholesale consolidation plan, in which case certain notice procedures are required. (See ABCL 55-c(2)-(5)). The second is a "breach of contract" claim, alleging generally that the termination was in violation of the Contract terms.

## DISCUSSION

### I. Rule 12 Motion to Dismiss

Defendant moves the Court to dismiss the case under Fed.R.Civ.P. Rule 12(b)(6). On a 12(b)(6) motion, the Court accepts as true the factual allegations in the complaint, viewing it in the light most favorable to the non-moving party. Crespo v. New York City Transit Authority, 2002 WL 398805 (E.D.N.Y. 2002) (Glasser, J.) (citing Bolt Elec., Inc. v. City of N.Y., 53 F.3d 465, 469 (2d Cir. 1992)). Dismissal under Rule 12(b)(6) is only

---

[6] ¶ 11.1 All disputes or differences which may arise in the course of fulfillment of, or in connection with, the present Contract, shall be considered by the Arbitration Court of St. Petersburg and the Leningradskaya Oblast. Awards of the said Court shall be final and binding upon both Parties.

[7] ¶ 11.2 Applicable law: laws of the Russian Federation.

appropriate if "it appears beyond doubt that the Plaintiff can prove no set of facts in support of her claim which entitle her to relief." Walker v. City of N.Y., 974 F.2d 293, 298 (2d Cir. 1992).

There has been some confusion with respect to the applicable legal factors to a challenge based upon a FSC, since it may be raised on a motion to dismiss or on a motion to transfer venue. See, e.g., Haskel v. FPR Registry, Inc., 862 F.Supp. 909, 912-16 (E.D.N.Y. 1994) (discussing the confusion generated by differing standards of analysis of foreign forum selection clauses in The Bremen and Stewart). See M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) ("The Bremen"); Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 33, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988). Little time need be spent on this question here, since transfer of venue to a non-federal court is not contemplated under 28 U.S.C. § 1404. It is thus proper to consider the motion under 12(b)(6).

## II. Forum Selection Clause

### A.    Law

In The Bremen, the contract between the parties provided that "any dispute arising must be treated before the London Court of Justice." 407 U.S. at 2. Relying on the FSC, a motion was made to dismiss the action brought in Florida for lack of jurisdiction. In granting the motion, the Supreme Court indicated a strong federal preference for the enforcement of forum selection clauses. It held that a "...forum clause should control absent a strong showing that it should be set aside." Id., at 15.[8]

---

[8] Although The Bremen involved a federal district court sitting in admiralty, the holding appears to be equally applicable to federal courts sitting in diversity. (Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 33, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (Kennedy, J. concurrence)). Here, the FSC points to an

Generally, a forum selection clause will only be enforced if it is mandatory or exclusive. John Boutari & Son v. Attiki Importers & Distribs., 22 F.3d 51, 53 (2d Cir. 1994); Central National-Gottesman, 204 F.Supp.2d 675, 678 (2d Cir. 2002). However, even a mandatory or exclusive forum selection clause can be overcome by a showing that the clause is unreasonable:

> A clause is unreasonable if: 1) its incorporation into the agreement was the product of fraud or overreaching; 2) the complaining party will be deprived of its day in court due to the grave inconvenience of the selected forum; 3) the chosen law is manifestly unfair so as to deprive plaintiff of a remedy; or 4) the clause is in contravention of a strong public policy of the forum state.

Central National-Gottesman, 204 F.Supp.2d at 678 (citing Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1363 (2d Cir. 1993). See also, Greater New York Automobile Dealers Assoc. v. Environmental Systems Testing, Inc., 211 F.R.D. 71, 84 (E.D.N.Y. 2002); Bense v. Interstate Battery Sys. Of America, Inc., 683 F.2d 718, 720 (2d Cir. 1982).

Finally, as noted in The Bremen:

> Thus, in the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside....The correct approach would have been to enforce the forum clause specifically unless [the non-movant] could clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching.

407 U.S. at 15.

## B.     The Contract's FSC

The foreign forum selection clause here is mandatory (Contract ¶ 4), and is

---

alternative state jurisdiction. Even if the contractually chosen forum was a non-state adjudicator, the Court would still analyze it under The Bremen. Foreign arbitration clauses, when considered in this context, are merely a subset of foreign forum selection clauses. Central National-Gottesman, Inc. v. M.V. "Gertrude Oldendorff", 204 F.Supp.2d 675 (2d Cir. 2002) (citing Vimar Seguros y Reaseguros, S.A. v. M/V SKY REEFER, 515 U.S. 528, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995).

therefore enforceable, provided it is not unreasonable. Plaintiff has not argued that the clause was a product of overreaching, nor has it asserted that it will be denied its day in Court or significantly inconvenienced if it were forced to bring suit in St. Petersburg. Plaintiff has also not alleged manifest unfairness stemming from the clause. Plaintiff's only contention is that enforcing the FSC would contravene the public policy of New York State, which provides contractual safeguards to New York wholesalers.

Baltika's motion proceeds along two general lines of argument, considered in turn. First, Baltika contends that ABCL § 55-c does not apply to out-of-state transactions. Second, it argues that the law does not constitute the type of "strong public policy" capable of defeating a valid FSC.

## III. ABCL Section 55-c

N.Y. Al. Bev. Con. Law § 55-c governs transactions between beer brewers and wholesalers. The purpose of ABCL § 55-c is provided for at subsection (1):

> Purpose: It is hereby declared to be the policy of this state, that the sale and delivery of beer by brewers to beer wholesalers shall be pursuant to a written agreement. That further, the regulation of business relations between brewers and beer wholesalers is necessary and appropriate to the general economy and tax base of this state and in the public interest.

ABCL § 55-c(1) (emphasis added).

The Statute specifically defines both "brewers" and "wholesalers." Section 55-c(2)(b) defines a "brewer" as:

> [A]ny person or entity engaged primarily in business as a brewer, manufacturer of alcoholic beverages, importer, marketer, broker or agent of any of the foregoing who sells or offers to sell beer to a beer wholesaler in this state or any successor to a brewer.

"Wholesaler" is similarly defined at § 55-c(2)(d):

> "Beer wholesaler" and "wholesaler" means the holder of a wholesaler's

license pursuant to section fifty-three of this article who purchases, offers to sell, resells, markets, promotes, warehouses or physically distributes beer sold by a brewer."

Section 55-c provides statutory protections to wholesalers through several safeguards, including limitations on the right of brewers to terminate wholesalers at-will. In particular, § 55-c(4)(a) provides, in essence, that a brewer may only terminate an agreement for "good cause." Pursuant to §§ 55-c(2)(e)(i) & (ii), "good cause" exists, in substance, when either the brewer implements a national or regional policy of consolidation or there is a failure by the wholesaler to comply with a material term of the contract, written notice is given to the wholesaler noting that breach, and the wholesaler has failed to take appropriate corrective action. Neither good cause basis is asserted here.

Additionally, the Statute requires notification, pursuant to § 55-c(3)-(5), prior to termination. SKI asserts such notice was not given. (<u>Compl.</u> ¶ 17). Finally, Section 55-c(6) provides for a private right of action.

## IV.  Statutory Interpretation

This case requires the Court to interpret the meaning and scope of ABCL §55-c, a matter of first impression. Statutory analysis begins with the text and its plain meaning. <u>See</u> <u>Natural Res. Def. Council, Inc. v. Muszynski</u>, 268 F.3d 91, 98 (2d Cir. 2001). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." <u>Marshak v. Treadwell</u>, 240 F.3d 184, 192 (2d Cir. 2001). Importantly, the statute at issue should not only be read in the context of the entire statutory structure, but absurd results should be avoided. <u>Natural Res. Def. Council,</u>

268 F.3d at 98.  If a statute is ambiguous, the Court must resort to "canons of statutory construction."  (<u>Gottlieb v. Carnival Corp.</u>, 05-2733-cv, decided Feb. 3, 2006) (citing <u>Natural Res. Def. Council</u>, 268 F.3d at 98).   If that fails to resolve the ambiguity, the Court must turn to the legislative history.  <u>United States v. Dauray</u>, 215 F.3d 257, 264 (2d Cir. 2000).

## A.    Interpreting Section 55-c(2)(b)

### 1.    Does "in this state" modify "wholesaler" or "sells or offers to sell?"

Baltika argues that the Statute only applies to sales or offers to sell that occur in the State of New York.  (Def. Mem. 10).  Baltika hangs this interpretation on the language of § 55-c(2)(b), which defines "brewers" subject to the Statute as "any person or entity engaged primarily in business as a brewer, manufacturer of alcoholic beverages, importer, marketer, broker or agent of any of the foregoing who sells or offers to sell beer to a beer wholesaler <u>in this state</u> or any successor to a brewer."  (emphasis added).  In effect, Baltika contends that "in this state" modifies the entire phrase which precedes it--"sells or offers to sell beer to a beer wholesaler".

Referring to the definition of "brewer" under § 55-c(2)(b),  SKI contends that because "in this state" directly follows "wholesaler," it must modify that word alone, "not the sales transaction through which the wholesaler has obtained the beer." (Pls. Mem 6).  Plaintiff contends that "this language reflects the statutory purpose of ensuring that New York licensed beer wholesalers are protected from brewers' unilateral termination."  (<u>Id</u>.).  Applying this definition, SKI contends that the Statute applies to any transaction entered into with a New York wholesaler.

The Court first examines the "plain meaning" of ABCL § 55-c. As Judge Posner once noted, "[j]udges realize in their heart of hearts that the superficial clarity to which they are referring when they call the meaning of a statute 'plain' is treacherous footing for interpretation." (<u>Friedrich v. City of Chicago</u>, 888 F.2d 511, 514 (7th Cir. 1989)).

From an atomistic point of view, § 55-c(2)(b) appears ambiguous. One might reasonably read the phrase "in this state" as qualifying "wholesaler"--and not the type of transaction-- subject to the Statute. Such a reading would also conform to the rule of the last antecedent, an interpretive canon which confines the effect of qualifying words and phrases to the word or phrase immediately preceding the qualifier. <u>Cf.</u>, <u>Barnhart v. Thomas</u>, 540 U.S. 20, 26, 124 S.Ct. 376 (2003). <u>See</u> <u>also</u>, 73 Am. Jur. 2d Statutes § 138.

However, Defendant's interpretation is also reasonable, because one could, despite the rule of the last antecedent, read the phrase "in this state" to refer back to the verbal phrase "sells or offers to sell beer." Here, the rules governing the ordering of phrases in the English language interferes with a clear application of the rule of the last antecedent. It is assumed that the legislature is aware of the rules of grammar when fashioning a statute <u>Flora v. U.S.</u>, 362 U.S. 145, 150, 80 S.Ct. 630 (1960), and the phrasing here simply follows the order of object, indirect object, and place standard to English and of which this Court may take judicial notice.

However, statutory construction is a "holistic endeavor." <u>United Sav'n Ass'n of Texas v. Timbers of Inwood Forest</u>, 484 U.S. 365, 108 S.Ct. 626 (1988) (Scalia, J.). Indeed, "a provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere that makes its meaning clear..." (<u>Id.</u>). When taking a holistic approach Courts must give

every word meaning–statutory construction should not render some of the text superfluous.  See Allen Oil Co., Inc.  v. Comm'r, 614 F.2d 336, 339 (2d Cir. 1980); U.S. v. Blasius, 397 F.2d 203, 207 (2d Cir. 1968).  Moreover, a Court should not reach an interpretive result that is absurd.  Harris v. U.S., 215 F.2d 69, 75-76 (2d Cir. 1954).

The crux of the difference between the parties' interpretations is whether any transaction anywhere in the world with a licensed New York wholesaler is covered by the Statute, or whether it pertains only to those transactions where the sale or the offer are made in New York.  Viewing the Statute as a whole and in light of its stated purpose, it is clear that the phrase "in this state" refers to the entire phrase preceding it as Defendant suggests.  Moreover, Plaintiff's interpretation raises the specter of unconstitutionality and therefore must be rejected.

Whatever ambiguity may be found in the definition of "brewer" when read in isolation is clarified by the purpose of the Statute, which provides for regulation of "the sale and delivery of beer by brewers" as a policy of the state of New York.  (ABCL § 55-c(1)).  As a conjunctive phrase, it requires both a sale and a delivery .  73 Am. Jur. 2d., Statutes § 156.  By Plaintiff's interpretation, that phrase would have to signify a sale and a delivery anywhere in the world.  Other sections of the ABCL drive the Court to conclude that the statute is instinct with the purpose of regulating the sale and delivery in this state of alcoholic beverages.  See, e.g., ABCL § 2 (stating, in relevant part, that: "[i]t is hereby declared as the policy of the state that it is necessary to regulate and control the manufacture, sale and distribution within the state.") (emphasis added); ABCL § 3(28) (which provides, in relevant part: "'to sell' includes to solicit or receive an order for, to keep or expose for sale, and to keep with intent to sell and shall include the

delivery of any alcoholic beverage in the state." ) (emphasis added).

In addition Plaintiff's advocated interpretation would run afoul of the dormant Commerce Clause. The Commerce clause provides that "The Congress shall have the power…to regulate commerce with foreign nations, and among the several states…" U.S. Const. Art. I, 8, cl. 3. Even when Congress has not expressly legislated in a particular commercial area, under the so-called 'dormant' Commerce Clause doctrine, a state's power to take action impacting interstate commerce is limited. The "Commerce Clause…precludes the application of a state statute to commerce that takes place wholly outside of the State's borders whether or not the commerce has effects within the State." Healy v. The Beer Inst., 491 U.S.324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (quoting Edgar v. MITE Corp., 457 U.S. 624, 642-43 (1982) (plurality opinion). "The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." (Healy, 491 U.S. at 336).

Plaintiff contends that the Twenty-First Amendment excepts state liquor control policy from being subject to the Commerce Clause. That Amendment states in relevant part that, "The transportation or importation into any state, territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. XXI Am., § 2. But as the Supreme Court specifically held in Brown-Forman Distillers Corp. v. New York State Liquor, 476 U.S. 573, 584-85, 106 S.Ct. 2080 (1986), the Twenty-First Amendment does not immunize state laws from invalidation when they have the practical effect of regulating liquor sales in other States.

Plaintiff's reading would impose New York's statutory regime for brewer-

wholesaler relations on agreements consummated and completed on the other side of the globe simply because the wholesaler was licensed under New York law. However, "a court should construe legislative enactments to avoid constitutional difficulties if possible." 2A Sutherland Statutory Construction, §45.11, p. 68-9 (6th ed. 2000) (citing Amer. Fed. of Labor and Cong. of Indus. Org. v. Kahn, 618 F.2d 784 (D.C. Cir. 1979).

Since that "sale and delivery" cannot be extraterritorial, it must be that it refers to those acts occurring within the state's jurisdiction–New York State. Seen in this light, it becomes clear that the only sensible interpretation is that "in this state" modifies the phrase "sells or offers to sell," aligning the definition with the overarching statutory purpose of regulating transactions involving the "sale and delivery" of beer in New York State. ABCL § 55-c(1).

That the New York legislature intended to limit the Statute to sales and deliveries in New York is largely uncontroversial, and may also be inferred from other sections of the regulatory scheme. Section 53, for example, which establishes regulations for wholesaler licenses, recognizes the limits of the legislatures power to control extraterritorial exchanges. Referring to the authority bestowed by the license, it states in relevant part:

> Such a license shall contain a description of the licensed premises and in form and in substance shall be a license to the person therein specifically designated to sell beer at wholesale in the premises therein specifically licensed to duly licensed wholesalers, retailers and permittees in this state, and to sell or deliver beer to persons outside the state pursuant to the laws of the place of such sale or delivery.

(ABCL § 53) (emphasis added).

Plaintiff rebuts this limitation by arguing that the overarching purpose of New York's alcohol regulatory framework includes an exercise of "its full authority under the

Twenty-First Amendment." (Pls. Mem. 7). In addition to the aforementioned constitutional concerns, this argument fails to be based upon the statutory language–Plaintiff's argument cannot bridge the gap between what New York State could have enacted and what it did enact.

The purpose of New York's ABC Law is provided at ABCL § 2, which states in relevant part:

> It is hereby declared as the policy of the state that it is necessary to regulate and control the manufacture, sale and distribution <u>within the state</u> of alcoholic beverages for the purpose of fostering and promoting temperance in their consumption and respect for an obedience to law.

ABCL § 2 (emphasis added).

The purpose of ABCL § 55-c, quoted <u>supra</u>, provides that, "...the regulation of business relations between brewers and beer wholesalers is necessary and appropriate to the general economy and tax base of this state and in the public interest." ABCL § 55-c(1).

Both statutes provide some measure of intent, but neither provides textual support for Plaintiff's contention that the New York Legislature has exercised its authority to the fullest extent authorized by the Constitution. With respect to the overarching and particular purposes referenced here, several points are relevant. First, it is clear that the overarching purpose of the ABCL is not to regulate out-of-state transactions, since it clearly aims to regulate those transactions "within the state."

Separately, it is also clear that the specific purposes of § 55-c are not coterminous with those of the ABCL in general, the vague reference to the "public interest" notwithstanding. Section 2 identifies the purpose of "temperance," while Section 55-c focuses on the general economy and tax base of the State.

-13-

From this follows a second point: even assuming that the ABC Law is generally justified under the state's power under the Twenty-First Amendment, it does not appear that "temperance" motivated the passage of § 55-c.[9] A quick reference to "temperance" in Plaintiff's Memorandum aside, the parties agree that the Statute's primary purpose is to correct a perceived imbalance in bargaining power between wholesalers and brewers by imposing non-negotiable terms on all such contracts.

Seen in the light of the professed statutory purposes, Plaintiff's argument puts the cart before the horse. In effect, SKI contends that because the State has authority to pass expansive legislation regarding alcohol, the Court should interpret the Statute as if it has exercised the fullest extent of that power. But the Court must interpret the Statute based upon what, in fact, the language of the Statute does provide. That Statute, however, provides no basis for such a claim.

The Court turns to the legislative history. There is virtually no legislative history in general, and what there is largely irrelevant. Other courts have noted as much. See Ryan Inc., v. Molson USA, LLC, 2005 WL 2977767 (E.D.N.Y. 2005); South End Distributing Corp. v. Hornell Brewing Co., Inc., 685 N.Y.S.2d 594 (Sup. Ct. 1999).

One comment extracted from a single document, bears comment. Baltika draws support for its interpretation from a comment by the Counsel to the Governor, which states, "[s]ubdivision (3) requires that all beer sold or delivered in New York State by a brewer to a wholesaler must be sold pursuant to a written franchise agreement..." (NY

---

[9] Whether the fullest extent of that power would override a federal policy of enforcing foreign FSC's, arguably a species of foreign arbitration clauses, is a question that this Court need not reach. (Cf., Ryan Inc., v. Molson USA, LLC, 2005 WL 2977767 (E.D.N.Y. 2005) (holding that the Federal Arbitration Act preempts, under the Supremacy Clause, the anti-arbitration clause of ABCL § 55-c(7)(c))).

Bill Jacket, 1996 S.B. 5410, Ch. 679). There is no indication that the author of this comment was considering the situs of the transaction, and it does nothing more than paraphrase the statutory language. The fact that the author is the Governor's legal counsel limits its relevance to the intent of the legislature. It thus offers only tepid support for Defendant's interpretation. Although the road of § 55-c's legislative history dead-ends, the foregoing analysis of the Statute itself compels the conclusion that it regulates only those sales and deliveries which take place in the State of New York.

### 2. Does § 55-c apply to the facts of this case?

The Statute applies to sales and deliveries in New York. Thus, the sale or offer to sell that would subject a brewer to the Statute must take place in New York. Pursuant to the Contract, the goods were "handed over" to SKI at Baltika's place of business, in Russia. (Contract ¶¶ 7.1, 7.2). That delivery was considered "completed...upon delivery by the Seller of originals of the export cargo customs declaration, waybill (CMR), Invoices and others goods-accompanying documents to the Buyer." (<u>Id.</u> ¶ 7.3). There is no allegation that the goods were transferred contrary to the terms of the Contract, nor that any aspect of the sale transaction in which Baltika was involved took place in or was intend for New York. It is therefore clear that there was no sale in the state of New York which would justify an application of § 55-c.

The parties brief a related question regarding the passage of title of the goods at issue. The parties dispute where the title to the goods was transferred. Defendant asserts title passed with delivery under Incoterms (<u>Haddad Bros. Inc. v. Little Things Mean A Lot, Inc.</u>, 2000 WL 1099866, at *2 n. 2 (S.D.N.Y., 2000)), while Plaintiff, citing more credible authority, argues that transfer of title is not conclusively determined by

Incoterms.  Texful Textile Ltd. v. Cotton Express Textile, Ltd., 891 F.Supp. 1381, 1388-89 (C.D. Cal. 1995).  However, the reasoning in Texful would direct the Court to either the language of the Contract or local law.  (Id.).  The Contract indicates that the transfer of all substantive rights in the product occurred prior to those goods ever reaching New York.

Local law would appear to serve Plaintiff no better.  Nothing more than speculation has been presented as to how Russian law would handle the question of delivery, and however it might interpret the Incoterms clause of the Contract cannot therefore help meet Plaintiff's burden here.  Were the agreement covered by New York law, however, which follows the Uniform Commercial Code for contracts for the sale of goods, the fact that there is no explicit Contract term dealing with title would make U.C.C. § 2-401 applicable.  Section 2-401(2) provides that "unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." (62.5 McKinney's Uniform Commercial Code, § 2-401 (2002)).

It is beyond dispute that physical delivery was made at the Baltika brewery in St. Petersburg.  Plaintiff's only assertion that the Incoterms clause is not decisive does not overcome this fact.  It cannot be inferred, even on a motion to dismiss, that if title was not conclusively transferred it was retained, when the undisputed Contract terms indicate a transfer of both the goods and shipping risks.  It is clear that neither sale nor delivery of beer by Baltika to SKI occurred in New York.

The Court turns next to an "offer to sell."  Neither the record nor the pleadings reflect any "offer" to sell in New York that would justify the imposition of the Statute.

The Complaint makes two allegations that arguably reference an "offer" by Baltika, but neither can support an inference that Baltika made an offer to sell in the state.

In identifying Baltika in the Complaint, Plaintiff states that "Baltika was and is a brewer and or manufacturer of alcoholic beverages which offered its products for sale within the State of New York." (Compl. ¶ 3). This, however, is a conclusory allegation that is far too vague to support an inference that Baltika availed itself of the New York market. This is made apparent by the Contract itself, which makes no reference to New York at all, nor gives any indication that Baltika offered its product for sale in New York any more than in California or Japan. At most, the Contract could support the inference that Baltika simply expected that its beer be exported, since numerous clauses deal with the export process. (See, Contract ¶¶ 9.1, 13.3, 6.7, 6.8).

Later, Plaintiff states that "SKI and Baltika entered into to [sic] an agreement...under the terms of which Baltika granted SKI the right to purchase beer brewed by Baltika and resell it in the State of New York." (Compl. ¶ 11). The statement is a misleading representation of the Contract itself, which only specifies that the beer be exported, and provides no specific indication that it is being sent to New York. Neither SKI's actual "resales" nor the possibility that the goods might be resold in New York can substantiate Plaintiff's reading of the Contract. Therefore, Baltika cannot qualify as a brewer subject to the Statute.

**B.      Would § 55-c defeat the forum selection clause?**

Assuming that the Contract fell within the scope of the Statute, the Court would find that it does not constitute a "strong public policy" capable of overcoming the federal policy favoring FSC enforcement. First, Plaintiff has failed to show that enforcement of

the FSC would impair rights protected by the Statute. Second, even if they would forfeit those rights, they are not substantial enough to constitute a "strong public policy."

Plaintiff offers only speculation as to what rights it would or would not maintain in St. Petersburg. Roby's guidance on this issue is instructive. (Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1363 (2d Cir. 1993)). The Roby Plaintiffs had invested in Lloyd's of London underwriting insurance syndicates. Those investors sued Lloyd's in federal district courts, asserting violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. See, e.g., Haynsworth v. Lloyd's of London, 933 F.Supp. 1315 (S.D.Tex. 1996); Riley v. Kingsley Underwriting Agencies Ltd., 969 F.2d 953 (10th Cir. 1992), cert. denied, 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992). The underwriting contracts included a clause that bound them to arbitration in England under English law. Roby, 996 F.2d at 1357. The Roby Plaintiffs asserted that "the public policy codified in the antiwaiver provisions of the securities laws renders unenforceable any agreement that effectively eliminates compliance with those laws." Id. at 1361-62. The Second Circuit found that there was a "serious question" whether the forum selection and choice of law provisions subverted U.S. public policy, stating that "the public policies of the securities law would be contravened if the applicable foreign law failed adequately to deter issuers from exploiting American investors." Id., at 1363-64. Nevertheless, the Roby Court enforced the FSC because the Roby Plaintiffs failed to show that English law did not offer adequate protections to investors to qualify as an acceptable alternative.

Here, Plaintiff's claim fails for similar reasons. Its assertion that New York law would not be applied and it would not have a substantive remedy in St. Petersburg is

unsupported by any evidence. Plaintiff's Memorandum merely states that, "there is a strong likelihood...that the Russian Arbitration Court will give effect to the unilateral termination provision..." (Plt. Mem. 16). Plaintiff, however, must do more than speculate that Russian law doesn't offer a substantive equivalent. Plaintiff bears the burden of demonstrating the "unreasonableness" of the forum selection clause. A simple assertion, as is the case here, that a particular state's statutory regime which is not controlling here will not be applied, is insufficient. (Cf. Albany Ins. Co. v. Banco Mexicano S.A., 1998 WL 730337 (S.D.N.Y. 1998) (mere allegations of a corrupt judicial system are not enough to defeat an otherwise valid forum selection clause)). Since Plaintiff has given the Court no indication of whether or not the law of St. Petersburg provides similar substantive protections, nor has it provided any evidence that its rights will not be protected under ¶ 13.7 of the Contract which provides for mutual payments after the termination of an agreement, there has been no showing capable of defeating the forum selection clause.

Finally, there is a "strong public policy in favor of forum selection and arbitration clauses. (Roby, 996 F.2d at 1361 (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 513 (1972); The Bremen, supra, 407 U.S. at 1)). Public policy concerns abrogate a contracted-for forum selection clause only in exceptional circumstances. Stewart Org., Inc. v. Ricoh Corp., 487 U.S. at 33. As a consequence, the mere identification of claims "under laws not recognized by the forum selected in the agreement" cannot suffice to defeat a forum selection clause. Roby, 996 F.3d at 1360-1361. "In the absence of other considerations, the agreement...must be enforced even if [it]...tacitly includes the forfeiture of some claims

that could have been brought in a different forum". Id. See also, Haynsworth v. Lloyd's of London, 933 F.Supp. 1315, 1323 (S.D. Texas 1996).

Section 55-c does not constitute a public policy strong enough to abrogate the forum selection clause. (See, Haynsworth, 933 F.Supp., at 1323 ("Whatever policy may be embodied in a consumer protection act, public policy strongly supports private law...Contractually selecting a forum for future litigation is not an impermissible waiver of rights and does not violate public policy, especially when the contracting parties are knowledgeable.")). See also, Cable-La, Inc. v. Williams Communications, Inc., 104 F.Supp.2d 569 (M.D.N.C. 1999) (evaluating the FSC under Stewart and holding that a state statute prohibiting forum selection clauses could not bar enforcement of the FSC). Finally, the cases to which Plaintiff cites are unavailing.[10]

Ultimately, the Supreme Court's reasoning in the Bremen bears heavily upon the Courts determination that the FSC must be enforced. In contemplating the issues at stake, the Court stated:

> Manifestly much uncertainty and possibly great inconvenience to both parties could arise if a suit could be maintained in any jurisdiction in which an accident might occur...The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting. There is strong evidence that the forum clause was a vital part of the agreement, and it would be unrealistic to think that the parties did not conduct their negotiations, including fixing the monetary terms, with the

---

[10] Sherman Street evaluates a forum selection clause under the multi-factor test for 28 U.S.C. § 1404, and therefore is inapposite. Both High-Life and Wimsatt are inapposite since they apply state law to a forum selection clause determination. See High-Life Sales Co. v. Brown-Forman Corp., 823 S.W.2d 493, 498 (Mo. 1992) (applying Missouri law); Wimsatt v. Beverly Hills Weight etc. Internat., Inc., 38 Cal Rptr. 2d 612 (Cal. App. 4th 1995) (applying California law). As Plaintiff admits, Tri-County Distributing, Inc. v. Canandiagua Wine Co., 623 N.E.2d 1206 (Ohio Sup. Ct. 1993) is inapplicable, since that Court determined no franchise relationship existed and therefore did not reach the question of whether a forum selection clause had to be enforced to the detriment of the application of the franchise law.

> consequences of the forum clause figuring prominently in their
> calculations... "The force of an agreement for litigation in this country,
> freely entered into between two competent parties, seems to me to be very
> powerful."

The Bremen, 407 U.S. at 13-14 (quotation omitted).  Much the same issues are in play

here.  "It defies reason to suggest that plaintiff may circumvent forum selection...clauses

merely by stating claims under laws not recognized by the forum selected in the

agreement."  Roby, 996 F.2d at 1360.  Whatever remedies SKI may have, they must be

pursued in St. Petersburg.

Because the case must be dismissed based upon the mandatory forum selection

clause, the Court does not consider the vague breach of contract allegations in the

Complaint.

## **CONCLUSION**

For the foregoing reasons, the Defendant's motion to dismiss is granted.


SO ORDERED.


Dated:         July 13, 2006
               Brooklyn, New York


               _____/s/_____
               I. Leo Glasser
               United States District Judge


On this day, copies of the foregoing were sent electronically to:

Gary Ettelman
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd., Suite 401
Garden City, New York 11530

Attorneys for Plaintiff

Stephen P. Davidson
Stephanie K. Vogel
DLA Piper Rudnick Gray Cary U.S., LLP
1251 Avenue of the Americas
New York, New York 10020-1104

Attorneys for Defendant